Case number 1932-12, Lake Building Products, Inc. v. Secretary of Labor, et al. Oral argument, not to exceed 15 minutes per side. Mr. Cakey for the petitioner. Good morning, Your Honors. May it please the Court. Andrew Cakey on behalf of the petitioner appellant, Lake Building Products. This case before you involves a very important question about how the fall protection standards in the steel erection standard that are adopted by OSHA, how those are interpreted. So just 50,000 foot overview. Typically speaking, under OSHA steel erection standard, if an employee is working at 15 feet or more, they are to have their personal fall arrestor system attached and they are to be connected to the structure. This case deals with what is commonly referred to as the connector exception. You can assume we've read your book. Okay, sure. Okay, so connectors are people defined by the statute who are using hoisting equipment to land and connect materials. Well, no, it's, they're using it, there's something about hoists, using a hoist, and they are placing and connecting. Correct. I use land, but it is placing and connecting is the proper term here. Placing and connecting. So let me take you. Can you just put this in context for me? There's a structure of a building, there's some girders up, and they are placing what to connect them where? Okay, and I'll talk, can I tell you about what was happening in this particular case? Because it really is illustrative. It would be helpful to me. I guess this is way out of my area of expertise, I guess. Okay, so the way these buildings are constructed, and we've all seen them driving down the highway, you put in vertical steel structures, then you put in cross members, so there's a structural steel, right? And you do that in a sequence. And you always work from back to front. And you do that because the crane operator needs to have the clearest view of where he's putting these loads. Because, you know, as the preamble to the steel erection standard indicated, it's pretty dangerous when these heavy loads are swinging in the wind. So in this particular case, what had happened was they had erected the first two bays of a sequence. What happens next is they load in structural steel decking. And they do that because at that point they put it there to stage it because to do it later in the process would be extremely difficult and more dangerous because there would be a roof structure. So they load up a lot of decking, which they're then going to connect at some point. Correct. The decking, is that like the structure for the floor, the wall? It's the structure for the floor. So it's interlock deck that they can pour concrete over and other surfaces. So that's what was occurring at the time of this inspection. The two individuals that the compliance officer witnessed were, in fact, wearing their fall protection equipment, and they both had what they call beamers on them, but they were not connected to the structure. They were landing this steel decking that was going to be staged and that was later going to be connected. The safety concern for why there's an exception for people who are connecting, placing and connecting, is the concern that when the placing is happening that the material might get out of line, come at them, they have to make a quick decision, and they need more mobility? Correct. So the testimony before, this standard is somewhat unique in that it was adopted through negotiated rulemaking, a process they called it CENRAC. It's the Steel Erection Negotiated Rulemaking Committee. My client actually had, as its expert witness, a union member who participated in the CENRAC committee. He testified before the ALJ that the purpose of the connector exception, the primary focus of it is to allow these guys who are between 15 and 30 feet to have some discretion to untie when there's loads coming in because they want the ability to move out of the way. When they're placing and connecting, how do you avoid the and connecting? Well, I think the word and, and obviously the secretary is focused almost exclusively on and, I think that's reading it too narrowly because, quite frankly, what is the difference? If I'm landing a bundle of steel decking that's not going to be attached, it's going to be staged, there is no difference in the hazard to me as an iron worker than if I'm landing a 2,000 ton, 2,000 pound beam that is going to be connected. The hazards are the same. Then why, I mean, number one, I think it's beyond our ken to make the assessment about what's more dangerous and what's safer. I mean, what we're pretty good at is figuring out what the words mean. I mean, obviously you have a great deal of expertise, but if what you just said was sort of the rationale, why not say or, and then each one is independently, as long as you have a hoist overhead, independently reasoned to have that judgment. Well, I think you can read it with and in the sentence. Wait, I mean, why would negotiated rulemaking, why would they put and there? Inartful drafting, and that's, I think, part of the problem here. I do think you can read it with and in. It's using hoisting equipment to place materials and using hoisting equipment to connect materials. It speaks about one employee. Is it physically possible for one employee to be placing and connecting at the same time? No, and it's typically, there's two employees involved in this job. Okay, but the regulation. No, you're correct. An employee who is placing and connecting. You're correct. It typically is. You can't actually be doing both at the same time. Right. You're always doing one or the other. Right. These are typically done roughly at the same time. So I want to talk, I think, probably the most important piece of this case is this concept of fair notice. Well, wait a minute. Sure, go ahead. I think to follow up Judge Radler's point, I mean, so it can't be done at the same time, but don't we have to construe this in a way that sort of makes them as close in time as practicable, given that the language here seems to say it has to, it really is suggesting some very close proximity, isn't it? I don't think it is, Your Honor. And I think the ALJ struggled with that because of the Sawyer-Steele case. In the Sawyer-Steele case, the facts were that the material was being placed, and it was very clear that it was going to be attached later. It did not say when later was. But later, you know, it sounds like it might have been a little while. Right. I mean, why wasn't the ALJ's formulation here pretty sensible? I mean, she said something like, you know, it was like sequentially or right away. She's adding language. Well, she's interpreting it, you know. We think she interpreted it wrong. And this takes me back to the fair notice piece. Yeah, okay. So the Steele Erection Standard was enacted in 2001. In the 18 years since its enactment, 18-plus years now, there has never been a single case that I'm aware of, and I've scoured it for quite some time, where an employer has been cited and it's been affirmed engaging in this activity. All the legal analysis on this question goes the other way. So you have Sawyer-Steele, which was an administrative law judge who said, hey, if you're placing the decking, or it was angle iron in that case, even if it's to be placed later, you're engaged in connecting work. That was a 2004 case. Then I think even more importantly, you have this California opinion letter. It's the same language, exactly. Yes, the California statute. It's their own rule, so they can do what they want, and they can read it in a crazy way if they want, but it is a take on the same language. It is the exact same language, Your Honor. And as I pointed out in the brief, the preamble to the Federal Steele Erection Standard actually mentions the California standard as an example of success, and this connector exception is working effectively. It seems like there's a treasure trove of stuff in that preamble for both sides. I think that's fair to say, Your Honor. So you have the Sawyer-Steele case saying this is connecting work, even if it's not going to be immediately attached. Then you have the California Division of Occupational Safety and Health interpreting the identical language and saying, landing of structural steel decking staged to be placed later, incidental to rest of construction, is connecting work for purposes of the exemption. Then you have a California case after that affirming that decision of the. . . What was the name of that case? It was Anning-Johnson. All right. And then to add on top of that, you've got 18 years of practice of the iron workers. And what's interesting about this case, and I do a lot of OSHA defense work, we had the president of the International Iron Workers Union, the gentleman who was on the CENRAC committee, and a number of local iron workers come and testify. All of them testified, particularly Mr. Rank, who was our expert, that. . . Is he the president guy that you just referred to? Correct. So Mr. Rank testified. . . He was or is the president? He is. He currently is. He testified at the hearing that in the process of the CENRAC negotiation committee, he personally created training materials that we presented at the hearing. Those training materials consisted of videos and other written presentations, all of which clearly depicted the landing of decking with individuals not tied off to the structure. It didn't. . . Do we have the videos? I believe you do. They were submitted with the record. Doesn't that training material specifically state that this doesn't necessarily mean it's complying with OSHA requirements? It does, and I think that's probably a function of the iron workers' lawyer. But, yes, it does contain a disclaimer that says nothing in this should be a guarantee that you're complying with OSHA. That's what it says, right? Well, it is what it says, but Mr. Rank's testimony was that he met with OSHA personnel, and his testimony was uncontradicted, that he met with OSHA personnel for two days going through this training, that they vetted it, they approved it, and now it is rolled out to all of the local iron worker unions in the country. And it still is. Now, you say in your brief that something like you said before, which is it's like industry practice or custom or whatever is uniformly to the contrary of the agency's interpretation. Correct. All right. So, I mean, what's your authority for that? I mean, what's the evidence that would allow us to infer, as opposed to lawyer testimony? Yeah, no, the appendix, the appendix. John Pagotchnik, the owner of Lake Building, who built the company from the ground up, testified that it is widely known in his industry, particularly in smaller steel erection companies, that the landing of decking is considered to be connecting work. What else you got? I mean, we're talking about, I mean, you're making an assertion about the entire industry custom. Right. Well, and Mr. Renk. So, he's the president of the iron worker union. Correct. And what does he say on this point? He testifies that all of the local unions in the country, and he testified that he travels around to all of them, use the training materials that he provided, and that those training materials dictate that landing decking incidental to structural work is connecting work. So. I'm sorry. Go ahead. Is it me to go hand in hand, placing and connecting? I guess there's just, your friend on the other side is going to say that there was quite a bit of time lag here between the placing and the connecting. And I would argue, Your Honor, that the standard does not put a temporal time frame. It doesn't say placing then connecting. And I think we go down a worm, as Judge Balmer, the ALJ in this case, started to do, trying to distinguish the Sawyer case by saying, well, it doesn't say that maybe they're going to place it 15 minutes later and that's okay, or what if it was going to be a day, is that okay? I think that's a slippery slope. But, well, I mean, isn't it safe to say, though, two or three weeks is not okay for meeting a placing and connecting standard while the hoist is over? I don't think so. And I go back to the point is the standard and the preamble make clear that it is focused on preventing the hazards of an incoming load. And that hazard is the same whether or not that load is going to be set on the deck for two weeks or whether it's going to be immediately connected. You know, I'm looking at the preamble, the one you're talking about, the preamble to standards for sealer. And I'm quoting, it says that, it explains it, quote, the definition of connector includes placing components as they are received from hoisting equipment and then connecting those components while hoisting equipment is overhead. So that certainly puts a temporal connection. It does a little bit, Your Honor. I mean, I think the key is that, is the presence of the hoisting equipment. Once that goes away, I think the connector. Well, that's one element. But I think Judge Gilman has just pointed out perhaps a reason to think there are two more, not just one more. Well, and I think that interpretation of the standard just ignores the practical realities of how these steel buildings are built. That's your notice point. Yes, yes. So there was placing, there was connecting. It happened a little bit later. Was there further placing during or after the connecting, that interim connecting? So the way these sequences work, and forgive me if I speak out of school. So they erect the structural steel, you know, the huge I-shaped steel that you see. Then they stage the decking in each of the areas. So in this particular case, they built the first floor of this building. They staged the decking in that area. They built the roof. They staged the decking, which is when this inspection occurred. And they do that throughout. They do not lay the decking. The compliance officer, everybody in this case was in agreement. Decking does not get attached until the building is completely. We should say placing, connecting, and then land and attach. I'm sorry. My apologies. I couldn't understand how that would be confusing. But decking is not connected until the building, the entire steel structure is erected. It's made sure it's plumb, and all the bolts and fineries are put in so they can make sure everything's level before they attach the decking. You could ask your friend on the other side about that, too. All right. You'll have your rebuttal. Thank you. We'll hear from the agents. May it please the Court. This Court should deny Lake Building's petition for review because the ALJ properly held that Lake Building violated OSHA's steel erection standard when its employees failed to use proper fall protection. Although the fall protection provisions contain a limited exception for employees engaged in connecting work, it's clear that Lake Building's employees did not meet this narrow definition. As the Court just heard, the definition of connector within the regulation is, quote, an employee who, working with hoisting equipment, is placing and connecting structural members and or components. It's clear from the plain language of this text that in order to qualify as a connector, you need to be both placing and connecting the structural members. It's physically impossible at the same time. To do it at the exact same time would be physically impossible, but and signifies doing it with some temporal proximity. According to the opposing counsel, when they place this decking, they never connect it simultaneously or contemporaneously. Well, we're not talking about doing it literally simultaneously. It's shown in the videos, but in placing the crane is lowering the steel decking and they are grabbing it and releasing it, and then they are connecting after. So it's not the same action, but they are done. The agency intended here was for the exception to apply only when they are done in conjunction here. Which it could have said, since it intended that. It could have given some temporal limitation. And it did in the preamble. Before I get to the preamble, just to make one final point about the language, it's a well-established canon of statutory and regulatory interpretation that where an agency uses different terms throughout a regulation, it's presumed to have done so purposefully and intended to give different meaning to those different terms. Now, within the very definition of connector, the agency used the term and or. It referred to structural members and or components. It also uses the term and or throughout the regulation. If the agency had intended to say placing or, it would have said placing or, or used and or, just as it did within that very same sentence. Aren't these things always done hand in hand? You can't connect without a place, without placing something. You place something because you're going to connect it. So these are always done together. That seems to be the quite natural understanding of it. Given both the language and the industry practice. Sure. Well, as we see in this case, they're not always done together. And when they're not, the exception should... But there's no reason to place unless you're going to connect. Your point is they're not done in the next day or two. It might be three weeks. But you only place to connect. And you only connect because something's been placed. Right. That is correct. But again, with the plain language here, if the agency had intended to say placing or connecting, it would have said that just as it uses the term and or in the very same sentence. Now, the preamble also supports this interpretation. Just real quick on the preamble business. Can you point us to, or can you edify us about the interpretive relevance of the preamble in interpreting the regulation? Is there case law on that that says this is the manner in which we consider the preamble when we're interpreting the reg that was part of that same fed reg document? Sure. Unfortunately... I mean, you deal with this all the time. So if you can just sort of edify briefly. On the spot, I cannot cite a case. What's the rule? The rule is that where the text is unclear. So generally... So it's only if it's unclear that it comes in? Generally, as I recall, the court will look to the text and the structure of a regulation to determine ambiguity. Where, again, as I recall, where the text is not entirely clear, then the court will look to the preamble. Well, we'll chase it down. Okay, go ahead. I'm sorry, I... So if you... I'm still back on the language. If you place on Monday and connect on Tuesday, on Monday or Tuesday, are you placing and connecting? So the court does not need to actually define what the parameters of the temporal proximity would be in order to find that there needs to be temporal proximity. The Ninth Circuit in the Crown Pacific case has found that temporal proximity is required without actually defining the parameters. But what is the answer to this question, in your view? It's very... I think it would... For the court, what would you say? Or if you're someone in the industry, try and understand what OSHA thinks about this. Sure. So the preamble makes very clear, as Judge Gilman noted, it says that connecting is placing components as they are received from hoisting equipment and then connecting those components while the hoisting equipment is still overhead, suggesting that they need to be done in a short enough period of time such that while the connecting is happening, the hoisting equipment is overhead. So in a vacuum, I would not be able to answer that question because it would depend on where the hoisting equipment is. The right line is the hoisting... It sort of makes sense to me that this is all about the hoisting equipment and not about placing and connecting, whether it happens the same day or the same hour or the same week. It's all about the hoisting equipment. Was the hoisting equipment still in place here at the time the connecting happened? Here, the hoisting equipment was not going to be. Not only did the... When the connecting happened, was the hoisting equipment in place? No, because here, with the way they were staging it... So the hoisting equipment was in the south, and they were starting... They were placing with the crane in the northeast corner, and they were moving south. And so they were not going to connect until they finished that sequence. And because of the topography of this building, on the other side of the building, there was a large slope and a pond, and so they were not going to be able to bring the hoisting equipment around. So not only was the connecting happening weeks after the placing here, but the hoisting equipment was not going to be anywhere near the workers when they were doing the connecting piece. I thought this was your best argument, which is what this is getting at is that the placing is dangerous. I mean, everything is dangerous, but the placing has a special danger because you have a crane with big objects moving around. And so that's ongoing. We afford some additional flexibility to the workers. But if the placing is completely done and there's no risk at all of injury from a hoisting device or something, then it should be sort of normal protocol. But if they're still in danger... I'm interested in your point. They're still in danger when the stuff's coming in for placing, so why wouldn't... Right, I was thinking the placing was done, but it's a little... You know, during the placing, why wouldn't they be able to have this latitude if they've got this thing coming at them? Sure. So here OSHA was trying to thread the needle because the preamble makes clear that the hazard they were trying to address was hazards from falls. The preamble recounts numerous instances when employees died, steelworkers, from falling off steel structures. There was some limited testimony. Again, as the court understands, this is part of a negotiated rulemaking process, that occasionally it is safer to have some freedom of movement and not to tie off. That being said, there was evidence presented that one employee who was using the fall protection was hit by the hoisting equipment and broke his arm, whereas another employee was hit by the hoisting equipment that was not using the fall protection and died. So OSHA was grappling with a lot of somewhat contradictory evidence, some showing that sometimes it is safer not to be tied off, but other times they were shown direct examples showing that, well, actually, the person that was tied off broke their arm and the person that was not was killed. And so using its expertise, OSHA carved out a very narrow exception here to the fall protection hazard, trying to protect the most employees possible. And as it reiterated time and again in the preamble, the connector exception was supposed to be, quote, defined as narrowly as possible and very specific. And the agency went on to say that connecting is distinguished from other steel erection activities by the elements in the definition. Now, if you were to read the and between placing and connecting, such that it means or, you could effectively read connecting out of the definition of connector, which not only makes little sense, but goes against the agency's express intention of requiring employees to meet all of the elements of the definition. I guess I would like to ask you about the notice issue. And, I mean, you argue in your brief that, hey, you know, and is not terribly mysterious and it's straightforward and the words itself provide notice. And that has some force, if your reading is correct. But what about Lake Building's evidence that there seemed to be a widespread practice to the contrary, kind of an and or practice rather than and. You have the president of the Iron Workers Union testifying arguably to that effect. And meanwhile, there's not a single enforcement case like this one for 18 years. And presumably, this isn't like, you know, the first time in 18 years somebody has done this. So why wouldn't there be maybe an argument along the lines of lulling or destitute where the agency, notwithstanding the language, just hasn't stopped a widespread practice for 18 years and then all of a sudden it happens on this day. And so they've been sort of led to think it was okay. Sure. Well, with respect to their point about industry practice, the preamble makes clear that industry practice actually varies widely. Many employers testified, and this is noted in the preamble, that they require their employees to use fall protection 100% of the time, no matter what the work they're engaged in, anytime they're six feet or more above the ground. Okay, but the preamble itself is back in 2001, right? That's correct. So we're talking, I think he's talking about since this reg went into place, this is how they've understood it. Nobody's really getting penalized for that. I mean, why isn't, if they could make that showing of widespread practice, no enforcement, why shouldn't they sort of, you know, be excused when they're the first one that's sort of surprised in their view? Sure. A few points. I think to claim that they are surprised by the fact that when the agency said and, it meant and. I get that. As a general matter. Let's say if the agency hasn't enforced that for 18 years. The agency has enforced that. So the Sawyer-Steele case obviously went against the agency. But... That's something, too. If that ALJ is reading it the way they do, now we're holding them to a higher standard of figuring this out. I think it's important to note that in that case, the secretary, although the secretary did lose, the secretary was making the same argument that placing is not connecting work. So to the extent they want to say, well, we looked to Sawyer-Steele, and, you know, per Sawyer-Steele, we thought this was connecting work. Well, per Sawyer-Steele, they were on notice of how the secretary interpreted it. But not the ALJ. The secretary didn't appeal, did they, in the Sawyer case? The ALJ's decision was never reviewed. The ALJ's decision was never reviewed, but that's important because that means it's not binding. It's one ALJ decision that is not precedential. And, again, all the ALJ says is that placing steel bundles that will later be connected is not connecting work. But we don't know what later means. Later could have meant... But it sounds like later, you know? I mean, it doesn't sound like the hoist is there continuously. That's not the vibe that I would get from that. And I guess I'm just saying, I mean, I do have some sympathy for what they're saying, you know, that, geez, I mean, we're iron workers. We're not lawyers. You know, an ALJ reads it like we are. We're reading it this way because we think this is what makes sense, and this is kind of what most people do. And the ALJ agreed, and California agrees on the exact same language. It's their regime. They could do something insane. But, you know, they're reading the same language. They have the same interpretation. Then all of a sudden, boom. I mean, ought not we have some sympathy for them? No, because, again, in this case, it's always important to remember that we're talking about the secretary interpreting and such that it means and. The secretary's interpretation is not only reasonable, but the most logical interpretation that is backed up by the preamble. It's impossible. It's, like, literally impossible for an employee to be placing and connecting at the same time. This regulation you're telling me is so clear that everyone understands it, and what's the problem with the company here? It's literally impossible for an employee. It's phrased as an employee. It doesn't say where employees are. It could say where employees are placing and connecting. It says an employee, and it physically can't do both those things. Sure, not in the exact same way. I know, but it says an employee. That's how it reads. I would disagree that it reads you need to be doing this at this same moment. I think... That's okay. All right, so that's fair, but then this gets us down the road of how do we interpret this and how clear is it, and I don't think quite as clear, maybe, as the secretary might think, and then what sort of notice. Just a lot of questions here, and a lot of the points kind of go the other way. Some go in your favor, I agree. Sure. I know my time is almost up, but if I could just address it again. I think I would disagree that it suggests that it needs to be done at the very same time, but to the extent there's any confusion, again, the statement that it needs to be... that Judge Gilman noted that connecting is placing components as they are received from hoisting equipment, and then connecting those components while the hoisting equipment is overhead clarifies that the agency was focused on a process that had temporal proximity. Now, with respect to the notice piece, again, Sawyer Steel is a non-precedential case, and there are not enough facts there for it really to even be persuasive. But, I mean, if we're talking about lake-building products and the folks that are working out there that day, I mean, the idea that the ALJ's opinion is not precedential, I mean, you know, that's kind of a tough thing to charge them with knowledge of and understanding of if they're just trying to sort this out as best they can. This is not the first time that they've been cited. This was a repeat violation. For this very thing? They have been cited... I don't believe there's been a case where it was found where they went on to argue about the connector exception, but they have been cited numerous times for failing to use fall protection. So this is an area where they're knowledgeable. With respect to the California decisions, again, not only is Anning-Johnson, the decision from the California Board of Appeals just not relevant because that deals with California OSHA and not federal OSHA. It's the same words. The point is it's an educated, thoughtful take on what those exact same words mean by a presumably responsible and careful government agency that's trying to achieve the same goals as the federal agency. I know it's not legally, you know, sort of binding. Sure. The thing is, even if that case were legally binding, it's really not even persuasive, though, because if you read that decision, the court does say placing bundles is connecting work, but that statement can at best be seen as dicta because then the California Board went on to immediately discuss a different regulation that involved work that was not connecting because the employees there were not using hoisting equipment, and so it was clear that the work they were engaged in was not connecting work. So that statement was not at all relevant to the larger holding.  We're just about out of gas up here. Thank you very much for your argument, and we'll hear rebuttal. With that in mind, Your Honor, I'll keep it brief. To your point, and I'm not disparaging counsel for the Secretary, and you can see in the appendix, at the time that the compliance officer arrived at this site, the crane was up and moving. The compliance officer testified, and I believe this is in the record, that he went over, the crane operator was in the cab preparing to do more loads, but he had stopped because the compliance officer... Where that would be in the record? That is... It will be in our brief, Your Honor. I could find it, but it would keep you up there more time. So there was... Bad luck of an inspector happening to be there to watch this. 19 years, it hadn't happened. Sort of like the volcano in New Zealand, once every 100 years, it's in the wrong place at the wrong time. I will not be traveling to New Zealand anytime soon. But the crane was in place. You can see it in the pictures. Had the compliance officer not showed up, the next thing that would have happened was those steel bundles would have been placed, and those guys would have moved over to connect structural steel. More structural steel would have come in. So it just works in sequence. And while they're working, that crane is always moving while they're there. And it's particularly important to them because they usually rent those cranes, and they're paying through the nose, so they want the crane going at all times when it's there. So that addresses one point. As to the California OSHA, I mean, clearly it's the exact same language that's at issue in our case. California is widely known as one of the most strict safety programs in the country. It's cited in the preamble as the basis for the current federal standard we're talking about. So for the ALJ to just say, well, it's California, that's irrelevant, that's not true. It does go to fair notice. When you've got a California decision, you've got an ALJ decision, and you've got years of practice of doing this stuff, how are you to know any different? How does the notice thing really help you that much? I mean, this wasn't a huge monetary fine. Well, because the case law says, the Walmart distribution case out of the Fifth Circuit, an employer has a Fifth Amendment due process right to have fair notice of the requirements of the standard. And without that, the citation goes away. Yeah, no, I understand, but it's just not that much money. You're fussing over $11,000. Well, it's fussing over an industry that is very, very, I mean, there was a reason that the president of the ironworkers agreed to testify on behalf of my client. That's because the ironworkers in general, in industry in general, are very concerned about the effect of this ruling, that OSHA has now changed the game by adopting this litigation tactic when, in reality, all they had to do, OSHA issues interpretation letters every day. All they would have to do is write a guidance document or an interpretation letter saying, hey, to the extent there was any confusion, landing of steel decking is not connecting work. They didn't do that in 18 years. Okay, but I mean, they've kind of more or less done that now. Does that... Well, that goes to the fair notice point. I know, but so if the $11,000 got taken care of and you have a decision from the agency that says what that guidance would say, is everything then kind of okay in this industry? I think for my client's interest, the citation shouldn't be upheld. If OSHA decides after the fact, hey, we need to remedy this, we're going to put out an interpretation letter, then yeah, I think you have... OSHA has curtailed the notice issue potentially. Are you worried about notice or are you willing... That's what I'm driving at. Are you worried about notice, which gets fixed probably in this litigation one way or another? They've taken a clear position. Or are you worried about not being able to have workers up there not tied off when they're just placing? We're really worried about both, Your Honour. My client is worried about notice. My client came to me and said, look, I've done this for 40 years, and at least since the standard's been in place since 2000, we've had inspections. As the Secretary pointed out, they have had inspections. There have been fall protection citations. They have not contested those. They didn't deal with connector work. This was the first time in business that they had heard of this. So they are concerned about the fact that, hey, why is it us that they're all of a sudden taking issue with? But the industry itself is also concerned that, hey, we read this connector exception to be focused on the dangers associated with hoists and overhead loads. And if you take away those guys' discretion while they're up there between 15 and 30 feet, we think that puts them at more risk. Okay. All right, well, thank you both for your arguments. The case will be submitted. It was very well briefed and argued. And the clerk may adjourn court.